## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, derivatively on behalf of LAS VEGAS SANDS CORP., <br><br> Plaintiffs, <br><br> v. <br><br> SHELDON G. ADELSON, MICHAEL A. LEVEN, IRWIN CHAFETZ, CHARLES D. FORMAN, JEFFREY H. SCHWARTZ, IRWIN A. SIEGEL, JASON N. ADER, GEORGE P. KOO, WING T. CHAO, <br><br> Defendants, <br><br> and <br><br> LAS VEGAS SANDS CORP.; <br><br> Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Louisiana Municipal Police Employees Retirement System ("Plaintiff"), by the undersigned attorneys, upon knowledge as to itself and knowledge and belief as to all other matters, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of Las Vegas Sands Corp. ("Las Vegas Sands" or the "Company") against certain of the Company's executive officers and members of the Las Vegas Sands Corp. Board of Directors (the "Board") seeking to remedy, among other things, defendants' waste of corporate assets and breaches of fiduciary duties involving illegal, improper and/or *ultra vires* conduct, including causing Las Vegas Sands

to violate, *inter alia*, the laws of the United States and the State of Nevada gaming control statutes and regulations. As a result of the alleged improper and illegal conduct, Las Vegas Sands and its Macau subsidiary are currently being investigated by a number of United States' federal and state civil and criminal authorities, including the United States Securities and Exchange Commission (the "SEC"), the Department of Justice (the "DOJ"), the Federal Bureau of Investigation (the "FBI") and the Nevada Gaming Control Board as well as the Hong Kong Securities and Futures Commission (the "SFC").  All of these investigations center around the Company's illegal and improper activities in Macau for, among other things, potential violations of the United States Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 *et seq.* (the "FCPA"), which prohibits bribery of foreign government officials, Nevada's gaming control statutes and regulations, and SFC regulations.

2.     Las Vegas Sands owns and operates casinos, convention centers, hotels and resorts in the United States, Singapore and Macau, a Special Administrative Region of the People's Republic of China.   Defendant Sheldon G. Adelson ("Adelson"), the principal stockholder of the Company, is the Chief Executive Officer ("CEO"), Treasurer and Chairman of the Board of Las Vegas Sands and exerts significant control over the Company's operations.  For all or most of the time period relevant hereto, the Company was a "controlled company" under the rules of the New York Stock Exchange, as Adelson, his family members and related trusts owned a majority of the Company's outstanding common stock.   There is no question that Adelson dominates the Board, as every year since the Company's initial public offering ("IPO") in 2004, its Form 10-K filed with the SEC has unequivocally admitted that "Mr. Adelson exercises significant influence over our business policies and affairs, including the composition of our Board of Directors and any action requiring the approval of our stockholders."

3.      Since the Company's IPO in 2004, Macau has been a highly important segment to the Company's bottom line and overall financial performance.  For example, since 2005, the first full year of operations for the Sands Macao, that segment of the Company has consistently accounted for the majority of Las Vegas Sands' total net revenue, increasing from 51.5% of total net revenues in 2005 to 61.5% of total net revenues in 2010, and accounting for as much as 73.8% of total net revenues in 2009.  Adelson, who is currently the chairman of the board of directors of Las Vegas Sands' 70.3%-owned subsidiary, Sands China Ltd. ("Sands China"), which owns and operates the Company's properties in Macau, has been intimately involved in the Company's aggressive and reported "combative" pursuit of expanding the Company's operations in the Macao region.  Indeed, an article published by *Reuters* on March 11, 2011, stated that "[n]o U.S. casino has more aggressively pursued the Macau dream than Las Vegas Sands."

4.      Adelson certainly had strong motivations for his harsh and aggressive expansion into Macau – to increase his significant financial stake in the Company which is currently valued in excess of $13.5 billion.  A June 2008 article in *The New Yorker* entitled "The Brass Ring:  A multibillionaire's relentless quest for global influence," stated that Las Vegas Sands' Macau casinos had helped make Adelson the third richest man in the United States.   Currently, according to *Forbes*, Adelson is the fifth wealthiest man in the United States and the sixteenth in the world.  Thus, Adelson was prepared to do anything necessary to expand his empire, even if it meant violating civil and criminal laws, rules and regulations while doing so.   *The New Yorker* article quoted Adelson's former vice president of legal and governmental affairs Shelley Berkley, now a United States Congresswoman, as describing Adelson as "***seek[ing] to dominate politics and public policy through the raw power of money***." (emphasis added).

5.     In addition to Adelson's well-known ruthless business tactics, any Las Vegas Sands shareholder would have good reason to be particularly concerned about the Company's expansion into the Macau region which has been described as rife with "widespread corruption in a region that resembles the Chinese version of the early years of Las Vegas."  However, the defendants have consistently caused Las Vegas Sands to assure its shareholders, year after year, that they had established "policies and procedures that the Board believes promote the highest standards of integrity, compliance with the law and personal accountability."  These significant measures and internal controls were established in order to protect the Company against any illegal or improper conduct as the defendants admit that it "is critical for the Company to maintain its good reputation."  Indeed, Las Vegas Sands' Code of Business Conduct and Ethics (the "Ethics Code") enumerates the type of prohibited conduct and even specifies that violations of the FCPA are expressly prohibited.  Furthermore, the Board even established a Compliance Committee to oversee and ensure compliance with the Ethics Code.

6.     However, despite the establishment of multiple policies and procedures in order to prevent misconduct, the Board was well aware that Adelson, among others, was not complying with the Ethics Code and other similar such provisions.  As described herein, Steven C. Jacobs ("Jacobs"), the former President and CEO of Sands China, who was hired in 2009 to repair relationships with local government officials that had been damaged as a result of Adelson's "rude and obstreperous" behavior, filed a wrongful termination action against Las Vegas Sands and Sands China in October 2010 alleging that he was improperly terminated in retaliation for refusing to comply with defendant Adelson's demands that he take certain actions in violation of the FCPA.

-4-

7.       Indeed, the Board is well aware of Adelson's harsh and ruthless business tactics, as Jacobs was not the first employee terminated for failing to carry out Adelson's wishes.  For example, in the fall of 2008, a number of senior management members petitioned the Board to create a special committee of members of the Board – which was named the Executive Committee – specifically to address disagreements between Adelson and these executives and due to the Board's complete and utter failure to institute appropriate mechanisms in accordance with its Board duties.  According to the Company's own public filings, these senior management members had "a loss of confidence . . . in the management of the company and [the Board's] governance process."    However, rather than create a truly independent committee to handle these serious conflicts, the Board, a majority of whom are still members of the Board today and are named defendants herein, disbanded the committee after only five months.  During the Executive Committee's short-lived existence, defendant Michael A. Leven ("Leven"), the Chairman of the Executive Committee, who was charged with resolving disputes between Adelson and senior management, instead, used his position to oust one of the members of senior management who was having disagreements with Adelson over the management of the Company, the Company's former President and Chief Operating Officer ("COO"), William Weidner ("Weidner"), and replaced Weidner with himself as Las Vegas Sands' President and COO – a position which reaped him over $4 million in compensation in 2009 alone.  Many, if not all, of the other executives who disagreed with Adelson were thereafter terminated.

8.       The termination of Weidner in turn caused the noisy resignation of former director James L. Purcell ("Purcell") who resigned from the Board because he was disgusted with the total lack of respect for the Board as Leven and the other members of the Executive Committee had terminated Weidner without any input or discussion of the entire Board.

Furthermore, after Leven used his position as Chairman of the Executive Committee to elevate himself to the position of President and COO, he and others negotiated an employment agreement for Leven without the approval of the Compensation Committee. In response, Purcell resigned as member of the Board, stating that "[n]o business enterprise should undertake the significant actions that have been and are proposed to be taken today without a full meeting of its Board."

9.    The Individual Defendants (as defined herein), as directors and/or officers of the Company, were aware of such illegal and improper conduct and failed to take any action to correct such actions or prevent their recurrence.

10.    The current directors will not objectively consider – let alone bring or vigorously prosecute – claims against themselves or the officers of Las Vegas Sands who were actively involved in the improper and illegal misconduct. Because the current Board is disabled from protecting or enforcing the Company's rights in this regard, Plaintiff brings these claims in the place and stead of the Las Vegas Sands Board of Directors to protect the Company. Indeed, the Company's 2010 Proxy Statement, admits that at least four of the Company's eight directors (defendants Adelson, Chafetz, Forman and Leven) are not considered independent and cannot consider a demand under Nevada law.

11.    As a result of the Individual Defendants' misconduct, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with governmental investigations of this misconduct.

<u>**JURISDICTION AND VENUE**</u>

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental

jurisdiction under 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Las Vegas Sands, a Nevada corporation, maintains its headquarters and principal place of business in this District.  Moreover, a substantial portion of the occurrences complained of herein occurred in this District.  In addition, one or more of the Defendants either reside in, or maintain offices in, this District.

## PARTIES

14.     Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS") is a citizen of the State of Louisiana.  LAMPERS is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.  Neither LAMPERS nor any of its trustees are citizens of a state in which any defendant is a citizen.

15.     Nominal Defendant Las Vegas Sands is a Nevada corporation with its corporate headquarters and principal place of business located in Las Vegas, Nevada.  According to its public filings, Las Vegas Sands, together with its subsidiaries, owns and operates the Venetian Resort Hotel Casino, the Palazzo Resort Hotel Casino and the Sands Expo and Convention Center in Las Vegas, Nevada; the Sands Macao, the Venetian Macao Resort Hotel, the Four Seasons Hotel Macao, Cotai Strip and the Plaza Casino in Macau; the Marina Bay Sands in Singapore; and the Sands Casino Resort Bethlehem in Bethlehem, Pennsylvania.  The Company is also creating a master-planned development of integrated report properties in Macau, referred to as the Cotai Strip.

16.     Defendant Adelson is the controlling stockholder of the Company and has served as its CEO, Treasurer and Chairman of the Board since its incorporation in August 2004.

Adelson has served as CEO and chairman of the board of directors of the Company's subsidiary, Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) since it was formed in April 1988.  According to Las Vegas Sands' Form 10-K filed with the SEC on March 1, 2011, along with his family members and related trusts, defendant Adelson owns approximately 49% of the Company's outstanding common stock, as of December 31, 2010.  In addition, defendant Adelson has served as Chairman of the board of directors of Las Vegas Sands' 70.3%-owned subsidiary, Sands China Ltd. ("Sands China"), which owns and operates the Company's properties in Macau, since August 2009.  Upon information and belief, defendant Adelson is a citizen of the State of Nevada.

17.    Defendant Leven has served as the Company's President and COO since March 2009 and as a director of the Company since its incorporation in August 2004.  Leven previously served as a director of Las Vegas Sands, Inc., from May 2004 to July 2005.  In 2009 alone, Leven received over $4.3 million in compensation as President and COO.  In addition, Leven served as a Special Advisor to Sands China's board of directors from October 14, 2009 to July 27, 2010.  Leven was appointed as Sands China's Acting CEO on July 23, 2010 and as a director thereof on July 27, 2010.  Upon information and belief, defendant Leven is a citizen of the State of Nevada.

18.    Defendant Jason N. Ader ("Ader") has served as a director of the Company since April 2009.  Upon information and belief, defendant Ader is a citizen of the State of New York.

19.    Defendant Irwin Chafetz ("Chafetz") has served as a director of the Company since March 2005.  Chafetz previously served as Vice President and a director of Las Vegas Sands, Inc. from 1989 to 1995, and again as a director from March 2005 to July 2005.  Upon information and belief, defendant Chafetz is a citizen of the Commonwealth of Massachusetts.

20.     Defendant Charles D. Forman ("Forman") has served as a director of the Company since its incorporation in August 2004.  Forman has served as a director of Las Vegas Sands, LLC, since March 2004.  Upon information and belief, defendant Forman is a citizen of the Commonwealth of Massachusetts.

21.     Defendant George P. Koo ("Koo") has served as a director of the Company since April 2008.  Upon information and belief, Defendant Koo is a citizen of the State of California.

22.     Defendant Jeffrey H. Schwartz ("Schwartz") has served as a director of the Company since March 2009.  In addition, he has served on the board of directors of Sands China since October 2009.  Upon information and belief, defendant Schwartz is a citizen of the State of Nevada.

23.     Defendant Irwin A. Siegel ("Siegel") has served as a director of the Company since February 2005.  In addition, he has served on the board of directors of Sands China since October 2009.  Upon information and belief, defendant Siegel is a citizen of the State of Georgia.

24.     Defendant Wing T. Chao ("Chao") served as a director of the Company from July 27, 2010 to approximately November 2010, at which point he became "an advisor to the Company on its design and development projects."  Upon information and belief, Defendant Chao is a citizen of the State of California.

25.     The Defendants identified in paragraphs 16 to 24 are referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control

and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets, and the highest obligations of fair dealing.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28. To discharge their duties as officers and directors of the Company, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority; and

    c.    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

29. The Individual Defendants, and all employees of the Company, were required to comply with the Ethics Code, which states that Las Vegas Sands "is committed to conducting its business in accordance with high ethical standards." The Company's annual Form DEF 14A

Proxy Statements filed with the SEC on April 23, 2010, April 30, 2009, April 29, 2008, April 30, 2007, April 28, 2006 and April 29, 2005, have consistently touted the Ethics Code as "establish[ing] policies and procedures that the Board believes promote the highest standards of integrity, compliance with the law and personal accountability."  The Ethics Code, which "is applicable to all directors, officers, including the principal executive officer, principal financial officer, principal accounting officer, employees and agents," prohibits certain conduct as in violation of high ethical standards such as improper loans and gifts, stating that:

### 1. Gifts and Contributions

Covered Persons or any member of their immediate families

(a) are not to give or accept, directly or indirectly, gifts, contributions, or prizes of more than minor value (e.g., $100 or more in value) which are in any way connected with the business of, or matters involving, the Company;

(b) are prohibited from soliciting gifts, contributions, gratuities, services, or kickbacks from suppliers or customers of the Company regardless of their value;

(c) may not accept the use of customer or supplier property, airplane transportation, or trips (including trips sponsored by customers or suppliers); and

(d) are not to give or accept, directly or indirectly, entertainment in excess of usual and reasonable limits that are a normal and acceptable part of regular business activity.

*      *      *

### 2. Loans

Covered Persons or members of their immediate families, may not loan money to, or borrow money from, individuals or concerns that do business with or compete with the Company, except transactions with banks and other financial institutions in accordance with normal business practices and except if fully disclosed to and approved by the Company.

30.     Furthermore, the Ethics Code expressly prohibits violations of the FCPA:

**11. Illegal or Unethical Payments, Gifts, Bribes, or Gratuities; Accuracy of Company Records**

*(a) The Company's policy is to comply strictly with the U.S. Foreign Corrupt Practices Act of 1977.  The Act prohibits payments or offers of payments of anything of value to foreign officials, political parties, or candidates for foreign political office in order to secure, retain, or direct business.  Payments made indirectly through an intermediary, under circumstances indicating that such payments would be passed along for prohibited purposes, are also illegal.*

*The Act also contains internal accounting control and record-keeping requirements that apply to the Company's domestic operations.  The Act's intent, in requiring these records, is to ensure that a business enterprise maintains reasonable control over its assets and all transactions involving those assets.  All employees are responsible for following Company procedures for carrying out and reporting business transactions.*

(b) Covered Persons must record and report information accurately and honestly.  This includes accurate reporting of time worked, business expenses incurred, research test results, revenue, and costs, and other business-related activities.  All Company records are subject to audit, and financial records should be maintained in accordance with generally accepted accounting principles.

Dishonest reporting, either inside or outside the Company, will not be tolerated.  This includes reporting or organizing information in an attempt to mislead or misinform.  No entry shall be made on the Company's books and records that intentionally hides or disguises the true nature of any transaction.

A Covered Person may not establish for any purpose an unauthorized, undisclosed, or unrecorded fund or asset involving the Company's money or other assets.

A Covered Person may not allow transactions with a supplier, agent, customer, or other third party to be structured or recorded in a way that is not consistent with generally accepted business practices.  (Emphasis added.)

31.    The Ethics Code further requires the Individual Defendants to comply with all

laws, rules, and regulations, which would include, *inter alia*, the FCPA and other anti-bribery

laws, securities laws and regulations, including those of SEC as well as the Hong Kong

Securities and Futures Commission (the "SFC"), and casino licensing laws and regulations, including those of Macau and Nevada. Specifically, the Ethics Code states:

### 2.0 Compliance with Laws, Rules and Regulations

### 2.1 General

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company's business, including any organization or body that regulates the Company, is critical to its reputation and continued success. All Covered Persons must respect and obey the laws of the cities, states and countries in which we operate and avoid even the appearance of impropriety. Covered Persons who fail to comply with this Code and applicable laws will be subject to disciplinary measures, including discharge from the Company.

32.    The Ethics Code also requires that the Individual Defendants comply with all reporting requirements of the SEC, gaming control authorities and other regulators:

### 3.0 Public Reporting

Full, fair, accurate, timely and understandable disclosure in the reports and other documents that the Company files with, or submits to, the Securities and Exchange Commission, gaming and other regulators and in its other public communications is critical for the Company to maintain its good reputation, to comply with its obligations under the securities laws and any other applicable laws and regulations and to meet the expectations of its shareholders, bondholders and other members of the investment community. Persons responsible for the preparation of such documents and reports and other public communications are to exercise the highest standard of care in their preparation in accordance with the following guidelines:

• all accounting records, and the reports produced from such records, must be in accordance with all applicable laws;

• all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;

• all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;

• no accounting records should contain any false or intentionally misleading entries;

• no transactions should be intentionally misclassified as to accounts, departments or accounting periods;

• all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

• no information should be concealed from the internal auditors or the independent auditors; and

• compliance with the Company's system of internal controls is required.

33.    The Company has established a Compliance Committee to ensure that the Ethics Code is properly maintained.  Further, the Ethics Code requires the Individual Defendants, as well as all other employees of the Company, to report any violations thereof.  The Ethics Code states in pertinent part:

**4.0 Business Ethics Oversight**

To ensure that the Code is properly implemented and administered, the Company has established a Compliance Committee composed of members of the Company's management.

The Compliance Committee is responsible for ensuring that the Code is properly implemented and administered.

**5.0 Confirmation of Compliance and Reporting**

At the commencement of employment or position with the Company, each Covered Person is required to confirm that he or she has read the Code and that he or she understands that compliance with the specific guidelines which are part of the Code is required during the term of his or her employment or position with the Company.  Thereafter, certain employees will be asked to reconfirm the statements regarding the Code which they made at the commencement of employment.

At the commencement of employment or position with the Company, Covered Persons are also required to disclose to the Company any conflicts of interest they may have with the Company under the Conflict of Interest Guidelines described in the Code.  In the event of conflicts which arise after the commencement of employment or position with the Company, Covered Persons are required to disclose such conflicts by completing and signing an appropriate form which can be obtained from the Company's Audit Services Group Department.

Every Covered Person is expected to report any violation of the Code or any applicable law of which he or she becomes aware. Individuals may choose to remain anonymous in reporting any possible violation of this Code. Employees who make reports in good faith regarding another employee's violation need have no fear of retaliation and the Company will ensure that any allegations are investigated and reviewed in the strictest possible confidence consistent with the particular situation.

Violations or potential violations of the Code must be immediately reported to the Company's General Counsel, Chairman of the Board and Chief Executive Officer or Chairman of the Audit Committee or through the other means outlined in the Company's Statement on Reporting Ethical Violations, including the Company's Ethics Hotline.

34.    Finally, the Ethics Code prohibits the Individual Defendants from engaging in illegal conduct, manipulation and other unfair dealing practices:

**6.0 Fair Dealing**

Each employee, officer and director, in carrying out his or her duties and responsibilities, should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through illegal conduct, manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

35.    In addition, the Las Vegas Sands Corp. Statement on Reporting Ethical Violations claims that the Company takes illegal and unethical conduct very seriously and encourages the Company's "team members" to report violations. Specifically, it states:

We take all misconduct very seriously, whether committed by senior managers or employees or by suppliers, contractors or other agents. Misconduct by anyone at or connected with the Company, at the very least, reflects poorly on our reputation, which we have all worked very hard to build over the years, and potentially exposes the Company to legal sanctions.

We therefore strongly encourage you to report any misconduct that you become aware of in the course of your employment or otherwise connected to your employment. Although it is impossible to list all of the conduct we are concerned about, we would expect you to report:

• Criminal conduct

• Fraud or deliberate error in the preparation, evaluation, review or audit of any of our financial statements;

• Fraud, misappropriation or other questionable practices related to the preparation or maintenance of our financial records;

• Misrepresentations or false statements to or by a senior officer or accountant regarding a matter contained in our financial records, financial reports or audit reports;

• Deviations from full and fair reporting of our financial condition;

• Failure to comply with, or efforts to circumvent, our internal compliance policies or internal control over financial reporting;

• Failure to comply with legal or regulatory obligations;

• Actions that endanger health or safety, or might cause environmental damages;

• Violations or potential violations of the Company's Code of Business Conduct and Ethics; and

• Actions designed to or that have the effect of concealing any of the foregoing.

36.    As members of the Board, each of the Individual Defendants was required by the Company's Corporate Governance Guidelines to, *inter alia*, "comply with all duties of care, loyalty and confidentiality applicable to directors of publicly traded corporations organized in our jurisdiction of incorporation," "adhere to the Company's Code of Business Conduct and Ethics, including, but not limited to, the policies on conflicts of interest expressed therein," and "avoid any action, position or interest that conflicts with an interest of the Company, or gives the appearance of a conflict."

37.    As members of the Audit Committee, defendants Ader, Schwartz and Siegel are required to comply with the obligations set forth in the Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is "to assist the Board... in fulfilling its oversight responsibilities with respect to (a) the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial

information provided by the Company to its stockholders, the public, any stock exchange and others, (b) the Company's compliance with legal and regulatory requirements... (e) the performance of the Company's internal audit function and independent registered public accounting firm and (f) such other matters as shall be mandated under applicable laws, rules and regulations as well as listing standards of the New York Stock Exchange."

38.   With respect to internal controls, the Charter provides that the Audit Committee is responsible for, among other things:

> 27.  In consultation with the independent registered public accounting firm and the internal audit group, review the adequacy of the Company's internal controls and its procedures designed to ensure compliance with laws and regulations and any special audit steps adopted in light of material control deficiencies.
>
> 28.  Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company of concerns regarding the questionable accounting or auditing matters.

39.   In light of the serious allegations contained herein, it is clear that the Individual Defendants failed to comply with the aforementioned policies and procedures and breached their fiduciary duties of loyalty and good faith by allowing the Company to be harmed by such misconduct.

## FACTUAL ALLEGATIONS

### Defendant Adelson's Domination and Control of the Company

40.   Defendant Adelson is the principal stockholder of the Company, owning, along with family members and related trusts, approximately 49% of the Company's common stock. Indeed, there is no question that Adelson dominates the Board, as every year since the Company's IPO in 2004, its Form 10-K filed with the SEC has unequivocally admitted that "Mr. Adelson exercises significant influence over our business policies and affairs, including the

composition of our Board of Directors and any action requiring the approval of our stockholders."

41.     In late 2008, the Board formed a special committee of directors Chafetz, Leven and Siegel to address, or give the appearance that the Board was addressing, significant disagreements between Adelson and other executives of the Company, in particular former President and COO Weidner.  Specifically, the Form 10-Q filed by the Company on November 10, 2008, stated:

> On October 29, 2008, certain members of our management team, including Sheldon G. Adelson, Chairman of the Board and Chief Executive Officer, William P. Weidner, President and Chief Operating Officer, Bradley H. Stone, Executive Vice President, and Robert G. Goldstein, Senior Vice President (the "Senior Management Members"), recommended to our board of directors that it institute additional corporate policies and procedures.   Upon such recommendation, our board of directors formed an executive committee (the "Executive Committee") comprised of Irwin Chafetz, Michael A. Leven and Irwin A. Siegel, with Mr. Leven being the Chairman of the Executive Committee. ***The role of the Executive Committee is to exercise the powers of the board of directors in between scheduled board meetings, including the power to resolve disagreements among management.***  Also, the board of directors gave Mr. Stone the additional responsibilities of President of Construction and Operations.  ***The board of directors adopted these measures to address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer and other Senior Management Members and in response to a loss of confidence by certain Senior Management Members in the management of the Company and our governance process.***  (Emphasis added).

42.     The role of the special committee, which was referred to interchangeably as the "Executive Committee" or the "Advisory Committee" in the Company's filings, was later stated simply as "to resolve disagreements among management."  Upon information and belief, this committee existed in name only and was ineffective.

43.     On March 4, 2009, defendants Leven and Forman, neither of whom are independent from defendant Adelson, informed Weidner that the Company was hiring Leven,

then a director, to replace Weidner as President and COO. The Company's Form 8-K filed on March 10, 2009, which announced such management changes, stated:

> The Company and Mr. Weidner attempted to negotiate the terms of Mr. Weidner's departure for the next several days [after the March 4th meeting], but were unable to reach agreement.

> On March 8, 2009, Mr. Weidner notified the Company that he was resigning from his positions at the Company for Good Reason... [and] also notified the Company that he was resigning from all of his positions at the Company's affiliates and from the [Las Vegas Sands] Board of Directors.

> \*          \*          \*

> In his resignation letter, Mr. Weidner stated that, as disclosed in [the Company's] periodic reports commencing with the report on Form 10-Q for the quarter ended September 30, 2008, he has had, and continued to have, outstanding differences with the Chairman and Chief Executive Officer about the management of the Company.

Attached to the 8-K was Weidner's letter of resignation, which stated that "I have had, and continue to have, outstanding differences with the Chairman and Chief Executive Officer [Adelson] about the management of the Company."

44.    In addition, on March 9, 2009, director Purcell resigned from the Board over his disagreement with the termination of Weidner. His letter of resignation was attached to a Form 8-K filed on March 13, 2009, and stated that he was resigning "because I have concluded that continued service in [my] capacities [as a director and member of the Board's Audit and Compensation committees] has become untenable." Specifically, Purcell's letter disclosed that Weidner's termination had not been a decision made by the Board in its entirety, but rather was made by certain directors, including Forman and Leven, who are admittedly not independent from Adelson. The letter further stated:

> Approximately ten days' [sic] ago, I was informed in a telephone conversation with Audit Committee Chairman, Irwin Siegel that "as we speak," Board members Charles Forman and Michael Leven were meeting with William Weidner, President, Chief Operating Officer and a director of the Company, to

request his resignation from those offices. In that call, Mr. Siegel also told me that if Mr. Weidner acceded to that request, Mr. Leven would be elected to serve as Co-Chief Executive of the Company with Sheldon Adelson, the present Chief Executive of the Company. In response, I expressed to Mr. Siegel my reservations as to the wisdom and timing of the discussions then in progress and of the proposed actions. Between that conversation and this afternoon no one apprised me of the outcome of the subject discussions with Mr. Weidner, and I assumed therefore that they had come to naught. Last evening (i.e. Sunday, March 8, 2009), there was received at my home a fax from the Company's Associate General Counsel accompanied by "drafts of Mike Leven's employment agreement and a side letter from S[heldon ]G[. ]A[delson]…"

*     *     *

***It was, in my judgment, wrong to engage in discussion with Weidner to request his resignation without a full and open discussion of the potential consequences of the series of actions that were planned. No business enterprise should undertake the significant actions that have been and are proposed to be taken today [a meeting of the Board's Compensation Committee to approve Mr. Leven's employment agreement] without a full meeting of its Board.***

In presenting this resignation, I do so with sadness because I am not unaware that submission of a non-quiet resignation has consequences not only for the Company but for me personally. I regret both, ***but management must respect the Board in its entirety and it has not done so***. (Emphasis added).

45.     Thereafter, on March 18, 2009, Bradley Stone, the Company's Executive Vice President and President of Global Operations and Construction and a "Senior Management Member" who had had "differences" with Adelson, notified the Company that he too was resigning from his position with Las Vegas Sands.

46.     On March 12, 2009, the special committee was dissolved "following changes in the Company's senior management." In other words, the committee was no longer needed because Adelson and certain directors had eliminated the members of senior management who had disagreed with Adelson over the management of the Company.

47.     In addition, since the Company's IPO, the Board has consistently allowed Adelson and his family members to receive numerous perquisites at the expense of the Company. For example, according to the Company's annual proxy statements, filed with the

-20-

SEC and disseminated to shareholders, the Company has incurred significant expenses providing security, automobiles and drivers for Adelson and his family members. In 2009 the Company paid over $2.4 million for security for Adelson and his immediate family. In 2007, 2008 and 2009, the Company paid $128,774, $173,291 and $163,812, respectively, for defendant Adelson's full-time automobile and driver, and provided an "annual reimbursement of professional fees of $100,000."

48.     Las Vegas Sands employs one of defendant Adelson's stepdaughters as his "special assistant," for which she received an annual salary of $98,100, $103,000 and $85,500, in 2007, 2008 and 2009, respectively. Likewise, the Company and its predecessors have employed defendant Adelson's wife, Dr. Miriam Adelson ("Dr. Adelson"), as Director of Community Involvement since 1990. Through 2007, the Company purchased products from defendant Adelson's brother's company, Deluxe Hotels Supply, LLC, for which the Company paid $1.8 million, $1.2 million and $1.0 million, in 2005, 2006 and 2007, respectively.

49.     In addition, Las Vegas Sands has entered into various aircraft time-sharing agreements with Interface Operations, LLC ("Interface Operations"), which is controlled by defendant Adelson, as well as other entities controlled by Adelson, pursuant to which the Company was charged over $6.6 million in 2009 and $5.8 million in 2008. In addition, Las Vegas Sands and Interface Operations are party to an administrative services agreement pursuant to which, *inter alia*, the companies share administrative expenses and the Company paid fees to related entity Interface Travel in the amount of $108,000, $138,000 and $165,000 for travel-related services in 2005, 2006 and 2007, respectively.

50.     Defendant Adelson and his family have in recent years made substantial additional investments in Las Vegas Sands. According to the Company's proxy statements, the

Company sold $475 million in aggregate principal amount of its 6.5% convertible senior notes due 2013 in a private transaction to Dr. Adelson, Adelson's wife, on September 30, 2008. Subsequently, on November 14, 2008, Dr. Adelson converted the $475 million aggregate principal amount of the convertible notes into shares of common stock at a conversion price of $5.50 per share. The Company issued Dr. Adelson over 86.3 million shares of common stock upon conversion of the convertible notes. At the time of the conversion of the convertible notes into Common Stock, the Company made an early interest payment in the amount of over $3.6 million on the convertible notes to Dr. Adelson.

51.     Also on November 14, 2008, the Company sold 5,250,000 shares of the Company's 10% Series A Cumulative Perpetual Preferred Stock and warrants to purchase an aggregate of up to 87,500,175 shares of common stock at an exercise price of $6.00 per share to Dr. Adelson. The aggregate purchase price paid by Dr. Adelson was $525 million. During 2009, the Company paid Dr. Adelson quarterly dividend payments on the preferred stock in the aggregate amount of $52,500,000.

52.     The Company also paid Dr. Adelson's legal fees in the aggregate amount of approximately $499,650 in connection with the convertible notes and the preferred stock and warrant transactions.

53.     The elimination of the Senior Management Members with whom Adelson did not get along, as well as the significant expenses incurred by the Company for the benefit of Adelson and his family, indicate that the Board has consistently given in to Adelson's demands and given him whatever he wants. In addition, defendant Adelson and his family's significant investments in the Company provide him with an incentive to maximize the success of the Company's

important Macau segment, as discussed below.  To ensure success in Macau, however, Adelson

has exceeded the bounds of law and legitimate business judgment, as alleged herein.

### Las Vegas Sands' Macau Operations

54.     The Company's Macau operations are extremely important to Las Vegas Sands'

overall financial performance.  Since 2005, the first full year of operations for the Sands Macao,

Las Vegas Sands' Macau segment consistently accounted for the majority of Las Vegas Sands'

total net revenue, increasing from 51.5% of total net revenues in 2005 to 73.8% in 2009.  Even

after the opening of the Marina Bay Sands in Singapore, the Macau segment still accounted for

61.5% of total net revenues in 2010, as shown in the following chart from the Company's March

1, 2011 10-K (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| **Net Revenues** | | | |
| Macau: | | | |
| The Venetian Macao | $ 2,412,990 | $ 1,993,531 | $ 1,945,561 |
| Sands Macao | 1,193,589 | 1,024,268 | 1,032,100 |
| Four Seasons Macao | 498,649 | 260,567 | 62,536 |
| Other Asia | 110,586 | 87,987 | 71,244 |
| | 4,215,814 | 3,366,353 | 3,111,441 |
| United States: | | | |
| Las Vegas Operating Properties | 1,213,046 | 1,106,263 | 1,339,740 |
| Sands Bethlehem | 302,101 | 153,198 | ------ |
| | 1,515,147 | 1,259,461 | 1,339,740 |
| Marina Bay Sands | 1,262,690 | ------ | ------ |
| Intersegment eliminations | (140,469) | (62,709) | (61,235) |
| Total net revenues | $ 6,853,182 | $ 4,563,105 | $ 4,389,946 |

55.     In addition, Las Vegas Sands has made significant capital expenditures with

respect to its developments in Macau.  According to the Company's annual Form 10-K's, from

2004 through 2010, the Company's total capital expenditures for its Macao operations was over

$6.5 billion, which ranged from approximately 19.3% to as much as 63.5% of Las Vegas Sands'

total capital expenditures each year.

## FCPA Violations and Other Misconduct in Macau

56.    Las Vegas Sands' public filings tout its "commitment to do business in

accordance with the highest standards of ethical business conduct."  However, the Company has

a history of questionable conduct with respect to its operations in Macau.  As reported by

Reuters on March 29, 2010, a Hong Kong jury's criminal convictions of four men in a murder-

for-hire case "shed[] light on the links between China's secretive triad societies and Macau's

booming gambling industry [and] raise[d] potentially troubling questions about one of the

world's largest gaming companies, Las Vegas Sands."  According to the Reuters article, entitled

"Special report:  High-rollers, triads and a Las Vegas giant," Cheung Chi-tai, the alleged

mastermind of a plot to murder a Sands Macao dealer suspected of assisting a patron in cheating

the casino and leader of a local Chinese organized crime group known as a triad, had ties to Las

Vegas Sands.  Specifically, the article states:

> Cheung was not just named as a triad member but also, according to a regular
> casino patron testifying in the trial, "the person in charge" of one of the VIP
> rooms at the Sands Macau, the first of three casinos run here by Las Vegas Sands.
> In addition, Cheung has been a major investor in the Neptune Group, a publicly
> traded company involved in casino junkets – the middlemen who bring wealthy
> clients to Macau's gambling halls.  Documents show that his investment allowed
> him a share in the profits from a VIP gambling room at the casino.
>
> An examination of Hong Kong court records, U.S. depositions from the former
> president of Sands, and interviews with law enforcement and security officials in
> both the U.S. and Macau, reveals a connection between Las Vegas Sands and
> Cheung – ties that could potentially put Sands in violation of Nevada gaming
> laws.

57.    The Company's involvement with triads and/or triad-connected junket operators

violates Nevada gaming control statutes and regulations, which prohibit Nevada-licensed casino

operators from engaging in activities or entering into associations that are "unsuitable" because

they discredit or reflect disrepute upon the Nevada gaming industry. As reported by Reuters, such laws "are meant to keep organized crime figures out of the casinos"; thus, "'[t]his relationship (with Cheung) would be of concern to Nevada authorities. You're talking about direct ties [between the Company and] bad guys.'"

58.    Even prior to the opening of the Sands Macao, the Company has run into legal problems in connection with the development of its Macau casinos. In 2004, an action was filed against Las Vegas Sands, Weidner and defendant Adelson by Richard Suen ("Suen") and his company, Round Square Company Limited ("Round Square"), captioned *Suen v. Adelson*, No. A493744, in the Clark County District Court in Nevada. The complaint alleges that shortly after the Macau government announced that it was going to end the existing government monopoly over gambling and issue permits to allow additional entities to operate casinos, Suen contacted Adelson and informed him that he and Round Square had government connections and could assist the Company in obtaining a gaming license in Macau. Suen further alleged that the parties agreed that the Company would pay Suen and Round Square a "success fee" if a permit was obtained, of $5 million upon the opening of the casino resort and 2% of net profits thereafter. A permit was eventually obtained and the Sands Macao opened in 2004.

59.    However, Suen alleged, when he attempted to collect the agreed-upon success fee, the defendants refused to pay him. Suen brought claims against the defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and quantum meruit. Although the district court granted summary judgment on the first three claims, a jury awarded Suen and Round Square $43.8 million on the quantum meruit claim. The Company appealed the verdict and Suen filed a cross-appeal. On November 17, 2010, the Nevada Supreme Court reversed in part and affirmed in part the lower court's decisions, remanding the

matter for a new trial and allowing Suen to proceed on his breach of contract claim against Las Vegas Sands. The litigation remains pending, thus, in addition to the significant amounts the Company has expended in litigation costs, it still may be liable for tens of millions in damages due to Adelson's ruthless business practices.

60.     Approximately six months after the Company's involvement with triads was reported, on October 20, 2010, Jacobs, the former President and CEO of Sands China, filed a wrongful termination action against Las Vegas Sands and Sands China. Jacobs alleges that he was improperly terminated in retaliation for refusing to comply with defendant Adelson's demands that he take certain actions in violation of the FCPA and other laws and duties.

61.     Jacobs alleges in his complaint that one of his tasks was to repair relationships with local government officials that had been damaged as a result of Adelson's "rude and obstreperous" behavior. It appears that Jacobs was successful. Sands China's 2009 Annual Report, which was filed with the SEC on May 10, 2010, stated:

> As the new Chief Executive Officer and President of Sands China Ltd., Steven Craig Jacobs acted swiftly to put a new management team in place, establish a new organizational structure, and drive new business strategies across the organization. Under his leadership, we:
>
> - Launched a variety of new products and services in 2009 including:
>
>   · The Paiza Mansions at The Plaza Macao
>
>   · A Poker Room at The Venetian Macao
>
>   · A high limit slot machine area at The Venetian Macao and Sands Macao
>
> - Successfully obtained new ferry routes and operating licenses to Tsim Sha Tsui, Kowloon and the Hong Kong International Airport in order to expand the reach of our transportation infrastructure and draw more visitors to Macao.
>
> - Successfully restructured our property operations and repositioned the Company's brands. We removed more than US$300 million in operating

expenses from our business and aligned our brands with their key customer segments.

- Introduced a rolling credit program and were one of the first gaming concessionaires to implement a cap on junket commissions, an initiative endorsed by the Macao Government.

- Successfully strengthened our balance sheet, setting the stage for growth both now and in the future. We achieved this by:

    ·     Negotiating new favorable loan terms with our existing lenders

    ·     Raising US$600 million through the sale of pre-IPO convertible bonds

    ·   Raising an additional US$2.5 billion through the listing of the Company's shares on the Stock Exchange

    ·   Repaying and fully settling all inter-company loans, which improved our debt to EBITDAR ratio to below 3:1

    ·   Obtaining commitments from a group of banks and financial institutions for US$1.75 billion in debt financing for the construction of Parcels 5 and 6 (the first phase of which is expected to consist of two hotel towers with over 3,700 Sheraton, Shangri-La and Traders branded hotel rooms).

    ·   Meeting with the Maca[u] Government, which reassured us that it would support all efforts to restart our development on Parcels 5 and 6 [of a section of Macau known as the Cotai Strip], including ensuring that we would have sufficient gaming tables and slot machines to successfully open the development project.

62.   However, Jacobs alleged that during the course of his employment with the Company from 2009 to 2010, Adelson demanded that:

    a.   Jacobs "use improper 'leverage' against senior government officials of Macau" in order to obtain development rights and permits for the Four Seasons Apartments;

    b.   Jacobs "threaten to withhold Sands China business from prominent Chinese banks unless they agreed to use influence with newly-elected senior government officials of Macau in order to obtain [such development rights and permits, as well as] favorable treatment with regards to labor quotas and table limits";

c.    "secret investigations be performed regarding the business and financial affairs of various high-ranking members of the Macau government so that any negative information obtained could be used to exert 'leverage' in order to thwart government regulations/initiatives viewed as adverse to [the Company's] interests";

d.    Sands China use the legal services of Macau attorney and member of the Macau Legislative Assembly and the Executive Council of the Macau Special Administrative Region, Leonel Alves ("Alves"), despite concerns that the retention of Alves, a Macau government official, posed serious risks under the criminal provisions of the FCPA, which prohibits a company from making corrupt payments to foreign officials for the purpose of obtaining or keeping business;

e.    Jacobs aggressively grow the junket business, which markets the Company's Macau casinos to VIP customers, despite Jacobs' opinion that the margins were low and that such business carried credit risks, and despite recent investigations by Reuters and other news outlets alleging Las Vegas Sands' involvement with triads connected to the junket business; and

f.    "Jacobs refrain from disclosing truthful and material information to the Board of Directors of Sands China so that it could decide if such information relating to material financial events, corporate governance, and corporate independence should be disclosed pursuant to regulations of the Hong Kong Stock Exchange.  These issues included, but were not limited to, junkets and triads, government investigations, Leonel Alves and FCPA concerns, development issues concerning Parcels 3, 7 and 8, and the design, delays and cost overruns associated with the development of Parcels 5 and 6" of properties the Company planned to develop in the Cotai Strip section of Macau.

63.    Jacobs refused to comply with defendant Adelson's demands, and, despite the successful results announced just two months earlier in Sands' China's annual report, on July 23, 2010, was terminated from his position as President and CEO of Sands China.  Las Vegas Sands' President, COO and director, defendant Leven, who at the time was also Special Advisor to Sands China's board of directors (which included defendants Adelson, Schwartz and Siegel), was named Acting CEO of Sands China.

64.    The anti-bribery provisions make it a crime to offer, promise, authorize or make a corrupt payment of money or other item of value to a foreign official.  Alves is a member of both

the Macau Legislative Assembly and the Executive Council of the Macau Special Administrative Region.  Alves had previously served as counsel to Sands China for approximately a year and a half, leaving the Company in February 2010.  He is listed in Sands China's Prospectus issued in connection with its initial public offering on the Hong Kong Stock Exchange in November 2009 as a legal advisor to Sands China.  The Company was aware that its retention of Alves posed potential problems under the FCPA, as defendant Leven acknowledged to the *Macau Daily Times* in August 2010, "When we deal with an individual that is a Government official – Alves is also a member of the Executive Council, and advising body to the local government – we have to follow the rules of the US.  So we are working our way through that."  Jacobs alleges that after his termination, Sands China "went forward with Adelson's desire to terminate its General Counsel… and replace him with Leonel Alves despite acknowledged disputes within Sands China regarding Alves' employment with the company" and related FCPA concerns.  Indeed, Alves informed the *Macau Daily Times* in September 2010 that he had been rehired as a legal advisor.

65.     In an interview with the *Jornal Tribuna de Macau* published on January 31, 2011, Alves was questioned about potential conflicts of interest between his positions as a Macau government official and as legal advisor to Sands China.  Although Alves denied any existing conflict, he recognized the possibility, acknowledging to reporters that if an issue arose in connection with his governmental role that involved one of the Company's casinos specifically, as opposed to issues relating to gaming laws generally, he would have to decline from intervening.

66.     In addition, as recognized in the Company's Ethics Code, the FCPA also requires companies that have issued securities registered with the SEC, such as Las Vegas Sands, to

maintain specific recordkeeping standards and adequate internal accounting controls to ensure compliance with the FCPA and prevent abuses such as failing to record or otherwise concealing improper transactions.

67.     In its March 1, 2011 10-K, Las Vegas Sands disclosed that both the SEC and the United States Department of Justice are investigating the Company's compliance with the FCPA, and that on February 9, 2011, it had received a subpoena from the SEC in connection therewith. Defendant Leven told the *Macau Daily Times* that the Company believes that the investigation was spurred by Jacobs' lawsuit, although he admitted that the subpoena also contains "some other mentions… about triads and things like that."  In addition, Leven stated that the subpoena seeks information "go[ing] back probably five years at least."

68.     Furthermore, it has been reported that the FBI and the Nevada Gaming Control Board are conducing similar investigations.  On March 11, 2011, *Reuters* published a follow-up report entitled "Special Report:  The Macau Connection," which stated:

> Earlier this month, the company acknowledged it had received a subpoena for documents pertaining to possible violations of the U.S. Foreign Corrupt Practices Act, which bars U.S. corporations from bribing foreign officials.  Not only are the Securities and Exchange Commission and Justice Department looking at Sands' actions, but the FBI has joined in.
>
> A Reuters investigation in collaboration with the Investigative Reporting Program at U.C. Berkeley has learned that casino executives, U.S. diplomats and the Chinese government share the concerns raised by Jacobs about Macau's booming junkets industry, which they describe as rife with organized crime.
>
> An extensive review of court records, interviews with high-level federal officials, and State Department cables obtained by WikiLeaks and released to Reuters through a third party, reveal widespread corruption in a region that resembles a Chinese version of the early years of Las Vegas.
>
> Among the Reuters-IRP investigation's findings:
>
> * The FBI has joined the federal investigation of Sands, prompted by the Jacobs allegations.

* Sands has an internal background report on an alleged criminal figure who had financial links to the company.

* Mainland China restricted visas to Macau based on its distress about the growing power of criminal groups, known as triads, in the region.

* U.S. casino executives have discussed with U.S. diplomats the pervasive influence of the triads in junkets for years – yet nothing has changed.

*      *      *

No U.S. casino has more aggressively pursued the Macau dream than Las Vegas Sands… where Las Vegas rivals went in softly, working with local businesses and regulators, Jacobs' suit and diplomatic cables suggest Sands wasn't there to make friends.

One diplomat in a cable referred to the casino's "combative" style.   Others describe how Sands executives have gone over the heads of Macau politicians to lobby ranking members of China's politburo, much to the chagrin of the locals.

Jacobs says in court filings that one of his primary tasks involved repairing "strained relationships with local and national government officials in Macau who would no longer meet with Adelson due to his rude and obstreperous behaviour."

*      *      *

In particular, Adelson insisted Jacobs hire a local lawmaker named Leonel Alves, he says in his lawsuit.  For more than a year, Alves, a public official in a position to help the corporation, was also listed as its counsel – a potential conflict of interest central to the U.S. federal bribery investigation.

69.     On March 31, 2011, Las Vegas Sands announced that Sands China is also under investigation by the SFC "in relation to alleged breaches of the provisions of the Securities and Futures Ordinance and has been requested to produce certain documents."

70.     It has also been reported that the Macau government has asked Sands China for a report on the various United States authorities' investigations and is monitoring the situation.

71.     In addition, comments by Adelson recently sparked an investigation by the Casino Regulatory Authority of Singapore, where the Company operates the Marina Bay Sands casino. On April 8, 2011, the authority announced that it had launched an investigation into illegal junket operations at Singapore's two casinos, including Marina Bay Sands.  The investigation

was initiated as a result of remarks made by defendant Adelson at a gaming forum in March. Adelson said that in November 2010, he discovered a transfer of $5 million between Macau and Singapore while viewing a list of high-end customers, which he said was "obviously a junket rep." According to news reports, the Casino Regulatory Authority has asked Las Vegas Sands to provide additional information in connection with its investigation.

72.    Upon information and belief, the Company has not undertaken any internal investigation of Jacobs' allegations. Rather, Adelson and Leven have publicly accused Jacobs of lying and in or about January 2011, Sands China and/or its affiliate, Venetian Macau Ltd., filed a criminal complaint with the office of the Macau public prosecutor seeking to initiate a criminal action against Jacobs for defamation and extortion. Leven has confirmed the existence of the criminal complaint to the *Macau Daily Times*. Upon information and belief, the board of directors of Sands China, which includes defendants Adelson, Schwartz and Siegel, approved the filing of the complaint against Jacobs, and therefore, the Las Vegas Sands Board was aware of and acquiesced in the filing of the complaint, despite Jacobs' allegations that Adelson demanded that he hide certain information from Sands China's board of directors.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

73.    The Individual Defendants, through their attendance at Board meetings, committee meetings, management meetings, conversations with Company's management, and review of Company documents, knew that Las Vegas Sands was violating the FCPA and Nevada gaming control statutes and regulations, and otherwise engaging in illegal and improper conduct in connection with its operations in Macau, *e.g.*, by retaining Alves, a Macau government official, as counsel to the Company, despite the FCPA's express prohibition against making payments to foreign government officials, and by maintaining associations with triad-influenced junket operators, despite the Nevada gaming control laws' prohibition against "unsuitable"

-32-

associations. In addition, the Individual Defendants knew that defendant Adelson was violating Las Vegas Sands' internal Code of Business Conduct and Ethics and other Company policies, which expressly prohibit violations of the FCPA and other laws and regulations as well as unfair dealing practices, by, *inter alia*, causing the Company to violate the FCPA, exert or attempt to exert improper leverage over Chinese government officials to obtain land concessions, and associate the Company with triad-influenced junket operators.

74.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants willfully approved the Company's illegal and improper conduct and failed to make a good faith effort to correct it or prevent its recurrence.

75.     As a result of the Individual Defendants' misconduct, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the multiple investigations of this misconduct, amounts spent by the Company employing corrupt officers and making bribes, and the costs of filing the defamation action against Jacobs.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

77.     Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

78.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

79.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile

and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

80.     As of the date hereof, the Board consists of eight directors, defendants Adelson, Ader, Chafetz, Forman, Koo, Leven, Schwartz and Siegel.   For the reasons stated below, a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

81.     As admitted in Las Vegas Sands' 2010 Proxy Statement, four of the Company's eight directors (defendants Adelson, Chafetz, Forman and Leven) are not considered independent by the Company.  Specifically, the 2010 Proxy Statement states that:

> [T]he Board has determined that four of the eight current members of the Board satisfy the criteria for independence under applicable rules promulgated under the Securities Exchange Act of 1934, as amended… and the NYSE corporate governance rules, namely Messrs. Ader, Koo, Schwartz and Siegel.

82.     Defendant Adelson, the principal stockholder, Chairman and CEO of the Company since August 2004, is incapable of disinterestedly and independently considering a demand to institute and vigorously prosecute this action because he is alleged to have driven the Company's actions in violation of the FCPA and other laws and duties, and accordingly, is substantially likely to be held liable for the wrongdoing complained of herein.   Moreover, defendant Adelson has made public comments demonstrating that he is incapable of independently considering a demand, stating to reporters that "[Jacobs] has attempted to explain his termination by using outright lies and fabrications which seem to have their origins in delusion."  Sands China and/or its affiliate, which are controlled by Adelson, chairman of the Sands China board, have also filed a criminal defamation complaint against Jacobs in Macau. Thus, defendant Adelson is incapable of impartially considering a demand to commence and vigorously prosecute this action.

83.     Defendant Leven, who has served as a director of the Company since August 2004, is incapable of disinterestedly and independently considering a demand to institute and vigorously prosecute this action because the principal professional occupation of defendant Leven is his employment with Las Vegas Sands as its President and COO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, including total compensation of $4,393,733 for 2009.  In addition, following the termination of Jacobs, defendant Leven has served as Acting CEO of Sands China, during which time Sands China retained Alves as counsel at defendant Adelson's behest, despite the FCPA concerns voiced by Jacobs.  Thus, defendant Leven lacks independence from Adelson, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

84.     Defendants Chafetz and Forman are each incapable of disinterestedly and independently considering a demand to institute and vigorously prosecute this action due to their business and personal relationships with Defendant Adelson.   The 2010 Proxy Statement discloses that:

> Mr. Adelson created and developed the COMDEX Trade Shows, including the COMDEX/Fall Trade Show, which was the world's largest computer show in the 1990s, all of which were sold to Softbank Corporation in April 1995.  Mr. Adelson also created and developed The Sands Expo and Convention Center, which grew into one of the largest convention and trade show destinations in the United States before transferring it to us in July 2004.  He was President and Chairman of Interface Group Holding Company, Inc. since the mid-1970s and is a manager of our affiliate, Interface Group Massachusetts, LLC, and was President of its predecessors, since 1990.

> \*          \*          \*

> Mr. Chafetz is a manager of The Interface Group, LLC, a company that owns and operates Interface Travel, a retail travel agency.  Mr. Chafetz has been associated with Interface Group Massachusetts, LLC and its predecessors since 1972.  From 1989 to 1995, Mr. Chafetz was a Vice President and director of Interface Group-Nevada, Inc., which owned and operated trade shows, including COMDEX,

-35-

which at its peak was the largest American trade show with a presence in more than 20 countries, and also owned and operated The Sands Expo and Convention Center, the first privately-owned convention center in the United States.

*       *       *

From 1995 to 2000, [Defendant Forman] held various positions with subsidiaries of Softbank Corporation… From 1998 to 2000, he was Chief Legal Officer of ZD Events Inc., a tradeshow business that included COMDEX, which was the largest tradeshow in the United States in the 1990s.  From 1995 to 1998, Mr. Forman was Executive Vice President, Chief Financial and Legal Officer of Softbank Comdex Inc.  From 1989 to 1995, Mr. Forman was Vice President and General Counsel of the Interface Group, a tradeshow and convention business that owned and operated COMDEX.

85.    Moreover, the Company admits in its 2010 Proxy Statement that both defendants Chafetz and Forman lack independence from defendant Adelson.  Specifically, the 2010 Proxy Statement states:

Two of our directors, Messrs. Chafetz and Forman, have business and personal relationships with our controlling stockholder, Mr. Adelson.  Mr. Chafetz was a stockholder, vice president and director of the entity that owned and operated the COMDEX trade show and The Sands Expo and Convention Center, which were created and developed by Mr. Adelson.  Mr. Forman was Vice President and General Counsel of this entity.  Mr. Chafetz is also a manager and a 14.7% member of entities that control Interface Travel and that are controlled by Mr. Adelson.  Mr. Chafetz also is a trustee of several trusts for the benefit of Mr. Adelson's family members that beneficially own shares of our Common Stock… These relationships with Mr. Adelson also include making joint investments and other significant financial dealings.  As a result, ***Messrs. Adelson, Chafetz and Forman may have their financial interests aligned and therefore, the Board does not consider Messrs. Chafetz and Forman to be independent directors***.

(Emphasis added).   The Company's proxy statements have consistently made the same disclosures regarding the non-independence of defendants Chafetz and Forman since each was appointed a director of the Company; in March 2005 and August 2004, respectively.   Thus, defendants Chafetz and Forman lack independence from defendant Adelson, rendering each of them incapable of impartially considering a demand to commence and vigorously prosecute this action.

86.     In addition, as members of the Audit Committee, defendants Ader, Schwartz and Siegel were required to ensure that the Company implemented and maintained adequate internal controls and procedures to ensure compliance with laws and regulations, including the FCPA. Upon information and belief, such defendants willfully ignored the Company's lack of effective internal controls and failed to make a good faith effort to correct these problems.  As a result, defendants Ader, Schwartz and Siegel each face a substantial likelihood of being held liable for breaching their fiduciary duties to the Company.  Accordingly, defendants Ader, Schwartz and Siegel are incapable of impartially considering a demand to commence and vigorously prosecute this action.

87.     Finally, defendants Adelson, Ader, Chafetz, Forman, Koo, Leven, Schwartz and Siegel's knowing violations of applicable laws are not protected by the business judgment rule because their illegal misconduct was not and could not be a legitimate exercise of business judgment.  Accordingly, each of defendants Adelson, Ader, Chafetz, Forman, Koo, Leven, Schwartz and Siegel is incapable of impartially considering a demand to commence and vigorously prosecute this action.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

90.     The Individual Defendants knowingly implemented and allowed the Company to engage in the improper and illegal business practices, as alleged herein, breaching their fiduciary duties of loyalty and good faith.

91.     The Individual Defendants willfully ignored the Company's lack of internal controls and procedures necessary to ensure compliance with the accounting provisions of the FCPA, and failed to make a good faith effort to correct the problems or prevent their recurrence.

92.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages as alleged herein.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

93.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94.     The Individual Defendants caused the Company to expend Company assets, *e.g.*, by using the Company's funds to improperly and illegally pay Alves and other government officials in violation of  the FCPA, which prohibits the payment of bribes to foreign government officials, and to finance its other improper business practices, such as the secret investigations of government officials.

95.     By implementing and allowing the Company to engage in the improper and illegal business practices discussed herein, the Individual Defendants wasted the Company's assets.

96.     As a direct and proximate result of the Individual Defendants' waste of corporate assets, the Company has sustained and will continue to sustain substantial damages as a result of excessive and unwarranted payments or the inequitable transfer of Company assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses;

C.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties; and

D.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 18, 2011

|  | LAW OFFICES OF CURTIS B. COULTER, P.C. <br><br> _/s/ Curtis B. Coulter_ <br> Curtis B. Coulter <br> 403 Hill Street, <br> Reno, Nevada 89501 <br> Telephone: (775) 324.3380 <br> Facsimile: (775) 324.3381 <br> ccoulter@coulterlaw.net |
|---|---|
|  | Eric L. Zagar <br> Robin Winchester <br> Kristen L. Ross <br> BARROWAY TOPAZ KESSLER <br> MELTZER & CHECK, LLP <br> 280 King of Prussia Road <br> Radnor, PA 19087 <br> Telephone: (610) 667-7706 <br> Facsimile:  (267) 948-2512 <br> ezagar@btkmc.com <br> rwinchester@btkmc.com <br> kross@btkmc.com <br><br> _Attorneys for Plaintiff Louisiana Municipal Police Employees Retirement System_ |

# VERIFICATION

I, R. Randall Roche, hereby verify that I have authorized the filing of the attached Verified

Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative

Complaint, and that the facts therein are true and correct to the best of my knowledge,

information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _April 11, 2011_

R. RANDALL ROCHE, GENERAL COUNSEL
LOUISIANA MUNICIPAL POLICE
EMPLOYEES RETIREMENT SYSTEM